### Real Estate Listing Service, Inc. *v.*
### Connecticut Real Estate Commission

Cotter, C. J., Bogdanski, Longo, Peters and A. Healey, Js.

Argued June 12—decision released September 11, 1979

*Charles M. Needle,* for the appellant (plaintiff).

*Timothy O. Fanning,* assistant attorney general, with whom, on the brief, was *Carl R. Ajello,* attorney general, for the appellee (defendant).

Arthur H. Healey, J. The plaintiff, Real Estate Listing Service, Inc. (hereinafter RELS), is comprised of a group of real estate brokers and is itself a licensed broker. The defendant is the Connecticut real estate commission (hereinafter commission). Pursuant to General Statutes § 4-176, RELS sought a declaratory ruling from the commission to determine whether, under certain circumstances, § 20-328-3 of the regulations of the commission would prohibit the plaintiff and its real estate brokers from negotiating the sale of real property pursuant to a certain real estate listing agreement. Section 20-328-3 of the regulations provides: "No licensee shall negotiate or attempt to negotiate the sale, exchange or lease of any real property directly with an owner or lessor knowing that such owner or lessor has an outstanding exclusive listing contract with another licensee covering the same property."

The plaintiff submitted a sample "Non-exclusive Listing Agreement"[1] (hereinafter RELS listing) to the commission with two questions. First, the plaintiff sought to know whether a broker who had executed a RELS listing with a property owner would be in violation of § 20-328-3 if he were to attempt to negotiate the sale of the property where another broker has, subsequent to the RELS listing, entered into an exclusive listing agreement with the same property owner. Second, the plaintiff

---

[1] In pertinent part, the RELS listing provides as follows: "This agreement is subject to section 53-35 of the General Statutes as amended (Public Accommodations Act). This will remain in effect until ................ and the owners also agree(s) to pay a commission of .......... of the agreed listed selling price. This listing is given to .......... as listing agent, who will distribute and solicit the assistance of each member of R.E.L.S. Inc. to find a purchaser for the above described property. It is agreed that this listing agreement does not restrict the owner's right to sell the property directly and without obligation to the listing agent, or to grant non-exclusive (OPEN) listing agreement to any other real estate agents. However, in order to insure a fair opportunity to show and sell the property during the term of this listing agreement, the owners agree not to grant any exclusive listing during the term of this agreement. Such an act on the part of the owners will be deemed a breach of this agreement causing damage to the listing agent. As damages will be difficult or impossible to measure, all parties to this agreement agree that the listing agent will be entitled to damages equal to the commission specified above on this listing agreement. It shall be payable by the owners at the time of granting an exclusive to any real estate agent on the above described property. The owners also agree to notify the listing agent of any change in the status of the property as to price and in the event of its sale will advise the listing agent in writing as to the names of the buyers, the selling price and the selling real estate agent.

Owner's ................... Address ........... Tel. ...........
Attorney ................................ Date ................
Listing Broker ............. Address ........... Tel. ...........
MEMBER REAL ESTATE LISTING SERVICE 816-1616

Listing information is as furnished by the Seller and its purported to be accurate but not guaranteed. This is a legally binding contract; if not understood, seek competent legal advice."

requested the commission to declare whether, in the situation set forth above, the agent who entered into an exclusive listing agreement with a property owner while the RELS non-exclusive listing agreement was in effect would be violating any regulation of the commission or any statute. The commission answered the first question in the affirmative and the second in the negative. RELS appealed from the commission's rulings to the Court of Common Pleas and sought a judgment declaring § 20-328-3 of the regulations invalid. The trial court concluded that the RELS listing is "mostly an open listing" cancellable by the owner at any time and that the regulation was a valid exercise of the state's power to restrict the right to contract. Accordingly, it entered judgment for the defendant commission.

From that judgment the plaintiff has appealed, claiming that the RELS listing is a valid contract and that the regulation impairs the obligation of contract, violates the plaintiff's right to due process and denies equal protection of the laws, and, therefore, is unconstitutional. Were we to adopt the interpretation accorded the regulation by the commission, we would conclude that the regulation as applied here is unconstitutional. We find it unnecessary to adopt the commission's interpretation of the regulation, however, and conclude that, properly interpreted and applied, the regulation is constitutionally sound.

I

The threshold question in this appeal is whether the RELS listing is an offer looking to a unilateral contract terminable by the property owner at any time before the agent's performance or a bilateral

contract with fixed rights and liabilities.[2] This initial determination is essential inasmuch as the plaintiff argues that a property right, which derives from a valid bilateral contract, has been destroyed by the regulation as interpreted by the commission. Because only three types of real estate listing agreements have traditionally been used in this state, the trial court felt obliged to place the RELS listing in one of the three commonly recognized categories. Those categories are: the open listing, under which the property owner agrees to pay to the listing broker a commission if that broker effects the sale of the property but retains the right to sell the property himself as well as the right to procure the services of any other broker in the sale of the property; the exclusive agency listing, which is for a time certain and authorizes only one broker to sell the property but permits the property owner to sell the property himself without incurring a commission; *Firszt* v. *Wdowiak*, 104 Conn. 744, 745, 133 A. 586 (1926); *Harris* v. *McPherson*, 97 Conn. 164, 167, 115 A. 723 (1922); see 12 Am. Jur. 2d, Brokers § 226; and the exclusive right to sell listing, under which the sale of the property during the contract period, no matter by whom negotiated, obligates the property owner to pay a commission to the listing broker. *Harris* v. *McPherson*, supra, 167, 171; see 12 Am. Jur. 2d, op. cit.; see also Gross, Illustrated Encyclopedic Dictionary of Real Estate

---

[2] We recognize the trend of recent authorities, including the Restatement (Second) of Contracts and the Uniform Commercial Code, not to use the terms "bilateral" and "unilateral." See Reporter's Note, Restatement (Second), Contracts § 12 (Tent. Draft No. 1, 1964). We employ the terms, however, because they are particularly useful in the analysis of the real estate listings we discuss in this opinion and do not here generate the adverse consequences sometimes said to flow from their mechanical application. See Calamari & Perillo, Contracts § 1-10.

Terms. The open listing, as described above, is an offer looking to a unilateral contract; that is, an offer that is accepted by performance. Although the property owner promises to pay the listing broker his commission when he produces a ready, willing and able buyer, he does not seek a promise in return from the broker, but only performance of the act requested. 1 Corbin, Contracts §§ 70, 71; 1 Williston, Contracts (3d Ed. Jaeger) §§ 13, 65. Although such offers are often referred to as "contracts," they do not obligate the broker to do anything; hence, they lack mutuality of obligation and are, therefore, unenforceable. See *Hess* v. *Dumouchel Paper Co.*, 154 Conn. 343, 347, 225 A.2d 797 (1966); *Thos. J. Sheehan Co.* v. *Crane Co.*, 418 F.2d 642, 646 (8th Cir. 1969); 1A Corbin, Contracts § 152; 12 Am. Jur. 2d, Brokers § 32. The traditional open listing merely gives a broker permission to sell real property within a specified time. Since it is unsupported by consideration, an open listing may, in the absence of part performance or action in reliance, be revoked at any time before the broker's performance without the property owner incurring any obligation. Ibid.[3] Both the exclusive agency and the exclusive right to sell listings, as distinguished from the open listing, constitute valid bilateral contracts. Under both, the property owner relinquishes to some extent the right, although not the power,[4] to alienate his real property. Likewise, the broker

---

[3] Historically, there have been differing views on whether part performance would constitute acceptance and prevent the promisor from revoking an offer looking to a unilateral contract. See Calamari & Perillo, Contracts § 2-24; Restatement (Second) of Contracts §§ 52, 63, 35A, 45 (Tent. Draft No. 1, 1964); § 90 (Tent. Draft No. 2, 1965).

[4] See *Harris* v. *McPherson*, 97 Conn. 164, 169–171, 115 A. 723 (1922); 12 Am. Jur. 2d, Brokers § 55.

incurs an obligation to use his best efforts during the contract period to procure a buyer.[5] Thus, the obligations being mutual, an enforceable contract has been formed and rights and liabilities have vested. Where an exclusive listing contract has been entered into, the respective obligations of each party are enforceable by the other even if the object of the agreement (the sale of the property) is never achieved.

The trial court concluded that the RELS listing is "mostly an open listing." This equivocal language reflects the flaw in the trial court's reasoning. Because the RELS listing contains a provision characteristic only of an open listing (permitting the property owner to obtain the services of other real estate brokers to effect the sale of his property), the trial court concluded that the RELS listing is essentially an open listing. As a consequence, the trial court ascribed to the listing submitted by the plaintiff all the features of an offer looking to the formation of a unilateral contract, including the promisor's right to terminate it at will prior to performance.

This interpretation is contrary to the plain language of the contract, which we cannot ignore. *Scribner* v. *O'Brien, Inc.,* 169 Conn. 389, 398, 363 A.2d 160 (1975); see *Anderson* v. *Pension & Retirement Board,* 167 Conn. 352, 355, 355 A.2d 283 (1974). The contract is for a term certain and provides for liquidated damages upon its breach.[6] The broker promises to "distribute [the listing] and solicit the assistance of each member of R.E.L.S. Inc. to find

---

[5] Even if the exclusive listing agreement fails to obligate the broker to use his best efforts to obtain a buyer, this condition is implied by law in § 20-328-6 of the regulations.

[6] We are not called upon to pass on the validity of the liquidated damages provision.

a purchaser for the above described property." The property owner promises to pay a set commission to the broker if the property is sold at the listed price, and also agrees "not to grant any exclusive listing during the term of [the] agreement." These mutual promises, which confer benefits and corresponding detriments on the respective parties, are sufficient consideration to support a bilateral contract. See Calamari & Perillo, Contracts § 4-1; 1 Corbin, Contracts § 142; 1 Williston, Contracts (3d Ed. Jaeger) § 100; *State National Bank* v. *Dick,* 164 Conn. 523, 529, 325 A.2d 235 (1973); *Finlay* v. *Swirsky,* 103 Conn. 624, 631–32, 131 A. 420 (1925). There being no essential element of a contract missing from the RELS listing or for which it does not make some provision, we must conclude that the RELS listing agreement submitted to the commission constitutes a valid bilateral contract.

## II

We must now determine whether § 20-328-3 of the regulations as interpreted and applied by the real estate commission is constitutional.[7] The commission decided that § 20-328-3 would be violated by Broker A where Broker A and a property owner execute the RELS listing, the property owner later enters into an exclusive listing agreement with Broker B, and Broker A thereafter continues to attempt to sell the property. The plaintiff claims that § 20-328-3 of the regulations, so interpreted, impairs the obligation of contract and thereby violates article one, § 10 of the United States constitution. We need not explore this claim in great detail

---

[7] We have already decided that § 20-328-3 of the regulations is not unconstitutional on its face. See *Brazo* v. *Connecticut Real Estate Commission,* 177 Conn. 515, 524–25, 418 A.2d 883 (1979).

inasmuch as the impairment of contractual obligations clause has long been interpreted to apply to state legislation or regulations; *Appleby* v. *Delaney,* 271 U.S. 403, 46 S. Ct. 581, 70 L. Ed. 1009 (1926); which, operating retrospectively, adversely affect the vested rights of parties to an existing contract. See *Ogden* v. *Saunders,* 25 U.S. (12 Wheat.) 213, 218, 6 L.Ed. 606 (1827); *Oshkosh Waterworks Co.* v. *Oshkosh,* 187 U.S. 437, 439, 23 S. Ct. 234, 47 L. Ed. 249 (1903); Congressional Research Service, The Constitution of the United States of America, Analysis and Interpretation (1973) pp. 406–407; 16 Am. Jur. 2d., Constitutional Law § 450. There being no actual contract with vested rights in existence in this case, the constitutional prohibition is inapplicable. Cf. *Elida, Inc.* v. *Harmor Realty Corporation,* 177 Conn. 218, 222–23, 413 A.2d 1226 (1979).

We now address the plaintiff's argument that the regulation as interpreted deprives it of property without due process of law. It has long been recognized that the right to make contracts is embraced in the concept of liberty under the due process clause of the fourteenth amendment to the United States constitution. *Morehead* v. *New York,* 298 U.S. 587, 610, 56 S. Ct. 918, 80 L. Ed. 1347 (1936); *West Coast Hotel Co.* v. *Parrish,* 300 U.S. 379, 391–92, 57 S. Ct. 578, 81 L. Ed. 703 (1937). It is also well settled, however, that the state may, in the exercise of its police powers, limit the freedom to contract where the health, safety, morals and well being of those subject to its jurisdiction require. *West Coast Hotel Co.* v. *Parrish,* supra, 391; *Cyphers* v. *Allyn,* 142 Conn. 699, 705, 118 A.2d 318 (1955). "[N]either the 'contract' clause nor the 'due process' clause has the effect of overriding the power of the State to establish all regulations that

are reasonably necessary to secure the . . . general welfare of the community." *Atlantic Coast Line R. Co.* v. *Goldsboro,* 232 U.S. 548, 558, 34 S. Ct. 364, 58 L. Ed. 721 (1914); see *Brazo v. Connecticut Real Estate Commission,* 177 Conn. 515, 524–25, 418 A.2d 883 (1979). The plaintiff's claim requires us to examine the regulation as interpreted by the commission to determine whether it serves some need of the public health, convenience and welfare in a reasonable and impartial way. *C & H Enterprises, Inc.* v. *Commissioner of Motor Vehicles,* 167 Conn. 304, 308, 355 A.2d 247 (1974); *Mott's Super Markets, Inc.* v. *Frassinelli,* 148 Conn. 481, 487, 172 A.2d 381 (1961). The prohibition imposed must have some rational relationship to a legitimate state interest sought to be protected. Ibid. We are mindful of the fact that the legislature, which has chosen to speak through a regulatory agency in this case; General Statutes § 20-328; see *Hartford Electric Light Co.* v. *Sullivan,* 161 Conn. 145, 154, 285 A.2d 352 (1971); has broad discretion in passing on the interest to be protected and the method to be employed. *Mott's Super Markets, Inc.* v. *Frassinelli,* supra.

We are unable to discern any rational basis for the commission's interpretation of the regulation. We are not confronted with an administrative determination that only certain types of real estate listings can be employed in Connecticut.[8] The regulations contain no such restriction and it is not our duty to fashion one. In the absence of a specific prohibition, the broad right that individuals have to fashion their contractual relations must prevail. It is the "general rule . . . that competent persons

---

[8] We do note, however, that a "net price listing" is prohibited in Connecticut. See Regs., Conn. State Agencies § 20-328-2.

shall have the utmost liberty of contracting and that their agreements voluntarily and fairly made shall be held valid and enforced in the courts." *Twin City Pipe Line Co.* v. *Harding Glass Co.*, 283 U.S. 353, 356, 51 S. Ct. 476, 75 L. Ed. 1112 (1931); see *Collins* v. *Sears, Roebuck & Co.*, 164 Conn. 369, 376–77, 321 A.2d 444 (1973). There is no doubt that the commission's interpretation of § 20-328-3 not only permits a real estate broker to obtain an exclusive listing and thereby violate an existing valid bilateral contract, but encourages him to do so. The commission's interpretation of § 20-328-3 does not further a legitimate interest of the state, and, in this case, operates in an arbitrary manner to deprive the plaintiff of a property right without due process of law.[9]

## III

We cannot adopt the interpretation accorded § 20-328-3 by the commission, which was accepted by the trial court. Although the factual and discretionary determinations of administrative agencies are to be given considerable weight by the courts; see General Statutes § 4-183 (g); *Board of Aldermen* v. *Bridgeport Community Antennae Television Co.*, 168 Conn. 294, 298–99, 362 A.2d 529 (1975); *Westport* v. *Norwalk*, 167 Conn. 151, 355 A.2d 25 (1974); 2 Am. Jur. 2d, Administrative Law §§ 645, 675; it is for the courts, and not for administrative agencies, to expound and apply governing principles of law. *N.L.R.B.* v. *Brown*, 380 U.S. 278, 291, 85 S. Ct. 980, 13 L. Ed. 2d 839 (1965); *International Brotherhood of Electrical Workers* v. *N.L.R.B.*, 487 F.2d 1143, 1170–71 (D.C. Cir. 1973), aff'd, sub. nom.

[9] Our conclusion on this portion of the plaintiff's argument makes it unnecessary for us to reach the plaintiff's claim that the regulation denies him equal protection of the laws.

*Florida Power & Light Co.* v. *International Brother-hood of Electrical Workers,* 417 U.S. 790, 94 S. Ct. 2737, 41 L. Ed. 2d 477 (1974); 73 C.J.S., Public Administrative Bodies and Procedure § 69. Because we have concluded that the commission's interpretation of the regulation would compel us to declare it unconstitutional, we must determine whether another interpretation of the regulation, which would result in sustaining its constitutionality, is reasonable.[10] *Lublin* v. *Brown,* 168 Conn. 212, 219, 362 A.2d 769 (1975); *Adams* v. *Rubinow,* 157 Conn. 150, 153, 251 A.2d 49 (1968).

We observe that the language of the regulation is plain and unambiguous. Simply stated, it enjoins a broker from negotiating or attempting to negotiate the sale or rental of real property where that broker is aware of an outstanding exclusive listing contract that the owner has entered into with another broker. The regulation does not purport to apply to a situation in which the property owner has earlier executed a valid bilateral listing contract, such as the one submitted by the plaintiff in this case. Thus, in terms of our earlier hypothetical, Broker A may, without violating § 20-328-3, continue to attempt to sell the property listed in the RELS listing despite a subsequent exclusive listing agreement with Broker B. The owner has breached his RELS listing contract by signing the exclusive listing agreement with Broker B. Broker B has not violated § 20-328-3 by obtaining an exclusive listing, although Broker B may thereby incur liability under private law principles arising out of tortious interference with contractual relationships.

[10] We must presume that the body that promulgated § 20-328-3 intended to comply with the constitution. See *Whitfield* v. *Empire Mutual Ins. Co.,* 167 Conn. 499, 507–508, 356 A.2d 139 (1975).

The proper application of § 20-328-3 of the regulations is illustrated in *Brazo* v. *Connecticut Real Estate Commission,* 177 Conn. 515, 418 A.2d 883 (1979). In *Brazo,* a real estate broker and a property owner had executed an exclusive real estate listing agreement for the sale of certain property. Thereafter, knowing of the existing listing agreement, another broker negotiated the sale of property included in that agreement. *Brazo* demonstrates the appropriate factual setting in which § 20-328-3 should be applied.

There is error, the case is remanded to the Superior Court[11] with direction to modify the declaratory judgment in a manner not inconsistent with this opinion.

In this opinion the other judges concurred.

[11] On July 1, 1978, the jurisdiction of the Court of Common Pleas was transferred to the Superior Court. General Statutes § 51-164s.