TOWN OF GREENWICH ET AL. *v.* DEPARTMENT OF PUBLIC UTILITY CONTROL ET AL.
(14039)

PETERS, C. J., SHEA, GLASS, COVELLO and BORDEN, Js.

Argued March 20—decision released June 4, 1991

*James R. Hawkins II,* with whom, on the brief, was *Kathleen Stone,* for the appellants (named plaintiff et al.).

*Robert S. Golden, Jr.,* assistant attorney general, with whom was *Tatiana D. Sypko,* assistant attorney general, for the appellee (named defendant).

*Joseph C. Lee,* with whom were *Marshall J. Touponse* and, on the brief, *Judith A. Ravel,* for the appellee (defendant Connecticut-American Water Company).

*Richard L. Barger,* for the appellee (defendant town of Stonington).

COVELLO, J. This is an appeal from a decision of the Superior Court dismissing the administrative appeals from two rate determinations of the defendant department of public utility control (DPUC). The issues on appeal are: (1) whether the DPUC may establish rates that do not precisely correlate with the cost of water service in a given district in order to equalize rates between two water districts; (2) whether the DPUC may reopen a rate proceeding on its own motion; and (3) whether the DPUC was required to notify Greenwich ratepayers about proceedings for approval of the acquisition of a water company when the costs associated with the acquisition were later shared in part by the Greenwich ratepayers.

The defendant Connecticut-American Water Company (company) is a public service utility company regulated by the DPUC pursuant to General Statutes § 16-1 et seq. The company was created in 1977 by a merger of the Mystic and Noroton water companies with the Greenwich Water Company. The company as merged provides service to approximately 24,000 customers in two distinct geographic districts. The Greenwich district includes the town of Greenwich and the Noroton section of Darien, while the Mystic district includes the towns of Stonington and Groton.

On December 16, 1986, the company applied to the DPUC for a "Phase I" rate increase and for permission to amend its rate schedules pursuant to General Statutes § 16-19. The company claimed that the amended rates were necessary to cover increased costs, maintenance and improvements. The DPUC held public hearings during March and April, 1987. On June 2, 1987, the DPUC issued a decision finding that customers in the Mystic district were paying 128 percent more than Greenwich-Noroton customers for the same volume of water and authorizing a 7 percent overall rate increase that was to be generated solely by an 8.8 percent increase in the Greenwich district rates. The Mystic rates were to remain unchanged. The DPUC denied the company's requested "Phase II"[1] rate increase but indicated that it "would entertain a request to re-open this [June 2, 1987] Decision" and, if the company did not request a reopening, the DPUC stated that it would reopen the decision on its own authority.

The plaintiffs appealed this decision to Superior Court. On January 4, 1988, the DPUC, on its own motion, reopened its June 2, 1987 decision. The DPUC again conducted public hearings and, on April 19, 1988,

---

[1] "Phase I" and "Phase II" refer to the company's two stage construction and implementation plan.

authorized the company to institute a new rate schedule that was higher than the "Phase I" schedule.

On May 16, 1988, the plaintiffs appealed the second DPUC decision to Superior Court claiming that the equalization plan was improper, that the rate increases were arbitrary and capricious, that the DPUC lacked the authority to reopen a prior decision on its own authority, and that the DPUC had failed to provide proper notice to Greenwich customers of the company's plans to acquire the Mystic water company. The trial court consolidated the appeals from the first and second DPUC decisions. On May 2, 1990, the trial court rendered judgment sustaining the decision of the DPUC on all issues and dismissing the appeals. The plaintiffs appealed to the Appellate Court. We thereafter transferred the appeal to ourselves in accordance with Practice Book § 4023 and now affirm the trial court's judgment.

I

The plaintiffs' first claim is that the DPUC was without statutory authority to initiate a rate equalization plan, between the Greenwich and Mystic districts, permitting the company to raise selectively the rates of discrete classes of customers. The gravamen of the plaintiffs' claim is that the authority of the DPUC, as an administrative agency, is limited to those powers expressly granted it by statute. *State* v. *White,* 204 Conn. 410, 418–19, 528 A.2d 811 (1987). Because the statutes do not expressly permit the DPUC to equalize rates between different districts served by one company, the plaintiffs argue that the agency's action was in excess of its statutory authority and therefore invalid. The plaintiffs also argue that the general policy underlying the enabling statute, and reflected in the prior practice of the DPUC, is to require customers to

pay only the costs associated with the services provided to them and to provide a reasonable rate of return on the owners' capital investment, not to equalize rates between different districts.[2]

General Statutes § 16-19a states, in pertinent part, that the DPUC shall "determine whether the rates of each . . . company are unreasonably discriminatory or more or less than just, reasonable and adequate, or that the service furnished by such company is inadequate to or in excess of public necessity and convenience . . . ." General Statutes § 16-19e (a) (4) states, in part, "that the level and structure of rates [shall] be sufficient, but no more than sufficient, to allow public service companies to cover their operating and capital costs, to attract needed capital and to maintain their financial integrity, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable." The authority of the DPUC thus described is consistent with the expression of legislative intent found in General Statutes § 16-11, which states: "The general purposes of . . . [section] 16-19 . . . are to assure to the state of Connecticut its full powers to regulate its public service companies, to increase the

---

[2] While not expressly stated in the plaintiffs' brief, we note that review of administrative appeals is governed by the Uniform Administrative Procedure Act, General Statutes §§ 4-166 through 4-189. Specifically we construe the plaintiffs' claims as based upon § 4-183 (j) (2), which provides: "The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing have been prejudiced because the administrative findings, inferences, conclusions, or decisions are . . . (2) in excess of the statutory authority of the agency." Furthermore, "[a]lthough the factual and discretionary determinations of administrative agencies are to be given considerable weight by the courts . . . it is for the courts, and not for the administrative agencies, to expound and apply governing principles of law." *Real Estate Listing Service, Inc.* v. *Real Estate Commission,* 179 Conn. 128, 138–39, 425 A.2d 581 (1979).

powers of the department of public utility control and to promote local control of the public service companies of this state, and said [section] shall be so construed as to effectuate these purposes."[3]

The DPUC's enabling statute thus evinces a legislative intent to rely on the DPUC to regulate and supervise public utilities, and to establish rates that are not unreasonable. The legislature, however, has not imposed upon the DPUC any specific formula or policy to use in setting rates.[4] In view of the remedial purpose of the statute, the lack of an express statutory formula and the evident legislative intent to rely on the DPUC's expertise, we conclude that the language of the enabling statute is sufficiently flexible to permit the DPUC to create necessary policies, including rate equalization, to guide its rate-making decisions.

The plaintiffs claim, however, that rate equalization is arbitrary, unreasonable and contravenes the statute because it is inherently discriminatory and because the

---

[3] This grant of power is consistent with the principles underlying the subject of rate regulation as a whole. "Courts have frequently observed that the task of rate-making require[s] expertise, technical skill, and constant attention and that it [is] obvious that legislatures were unable to discharge this obligation directly." 1 J. Sutherland, Statutory Construction (4th Ed. Sands) § 4.20. As a result, enabling statutes have been construed as an expansive grant of authority to administrative agencies, and have been interpreted in a manner that allows the agencies significant latitude in setting rate policies. *Federal Power Commission* v. *Hope Natural Gas Co.*, 320 U.S. 591, 600–602, 615, 64 S. Ct. 281, 88 L. Ed. 333 (1944); see also *Hartford Electric Light Co.* v. *Water Resources Commission*, 162 Conn. 89, 93, 291 A.2d 721 (1971); *Connecticut Co.* v. *Norwalk*, 89 Conn. 528, 533, 94 A. 992 (1915).

[4] "[R]ate-making bodies [are not bound] to the service of any single formula or combination of formulas. Agencies to whom this legislative power has been delegated are free, within the ambit of their statutory authority, to make the pragmatic adjustments which may be called for by particular circumstances." *Power Commission* v. *Pipeline Co.*, 315 U.S. 575, 586, 62 S. Ct. 736, 86 L. Ed. 1037 (1942).

statute requires that rates be set only with regard to the cost of service and the need to attract capital. We disagree.[5]

The plaintiffs argue that equalization is arbitrary and discriminatory because it unfairly imposes a disproportionate rate increase on a given district without regard to the cost of service to that district. A decision to establish any rate in a multi-service environment inevitably results in the same rate for different ratepayers whose actual costs of service may differ. For example, in a single community there will inevitably be differences in the cost of service to ratepayers on different streets or in different residences. Furthermore, the statute nowhere requires that the DPUC base its cost analysis at the city or district level. The DPUC relying upon its expertise and after a thorough review of the evidence, has decided to equalize rates between districts. We conclude that there is nothing in the statute to compel the conclusion that equalizing rates at this level is unreasonably discriminatory as a matter of law and we are therefore unwilling to disturb the decision of the DPUC.[6]

---

[5] The plaintiffs also claim that the DPUC has opposed rate equalization in the past. The defendants vigorously deny this. Regardless of whether the DPUC in fact has opposed equalization in the past, we have held that an agency is permitted to change position in the face of changed circumstances. *Grillo* v. *Zoning Board of Appeals,* 206 Conn. 362, 367, 537 A.2d 1030 (1988); see also *NLRB* v. *J. Weingarten, Inc.,* 420 U.S. 251, 265–67, 95 S. Ct. 959, 43 L. Ed. 2d 171 (1975). Furthermore, the fact that the DPUC may have opposed equalization in the past does not imply that it lacked the statutory power to apply rate equalization.

[6] The plaintiffs also argue that the legislature has authorized rate equalization in the context of satellite management programs; General Statutes § 16-262r (d); and that the failure of the legislature to provide for rate equalization in other contexts indicates a legislative intent to prohibit equalization. We disagree. Section 16-262r (d) is a specific provision addressing a narrow range of programs and it is entirely consistent for the legislature to describe more precisely the powers of the DPUC in this regard. As has been noted above, however, General Statutes § 16-19 is a general grant

## II

The plaintiffs next argue that the DPUC exceeded the scope of its authority in reopening the rate hearings to consider the company's "Phase II" request. In the June 2, 1987 decision regarding the "Phase I" rate request, the DPUC said that it would "entertain a request to reopen" the decision and, in the absence of such a request, would reopen the decision on its own motion. On November 19, 1987, the company made such a request, to which the plaintiffs objected. The DPUC thereafter decided, upon its own motion, to reopen the hearings. The plaintiffs argue that it is beyond the powers set out to the DPUC in General Statutes § 16-19h to reopen a decision in this manner.

General Statutes § 16-19h provides, in pertinent part, that the DPUC may reopen a proceeding on a proposed rate amendment "to reflect the increased cost of (1) water purchased from another such water company or a municipal utility furnishing water, if such increased cost results from the approval by the department or the legislative body of the municipality . . . [or] (2) electricity purchased from an electric public service company or a municipal utility furnishing electricity, if such increased cost results from the approval by the department or the legislative body of the municipality . . . ." The plaintiffs argue that when a statute thus lists specific circumstances under which an action may be taken, there is an implied prohibition against taking the action under other circumstances.

of power to the DPUC to establish rate schedules and, by its very terms, indicates a legislative intent *not* to restrict the DPUC to any particular formula or policy.

The plaintiffs further argue that the legislature has previously considered and declined to permit equalization. We note, however, that "unsuccessful attempts at legislation are not the best of guides to legislative intent." *Red Lion Broadcasting Co.* v. *FCC,* 395 U.S. 367, 381–82 n.11, 89 S. Ct. 1794, 23 L. Ed. 2d 371 (1969).

Section 16-19h, however, governs only the reopening of rate proceedings involving companies "which [supply] water to not more than two hundred fifty service connections or one thousand persons . . . ." The trial court found that the company here supplies water to 80,000 people in the state. By its terms, therefore, the statute does not apply to this case. Because "it is not the province of a court to supply what the legislature chose to omit"; *Federal Aviation Administration* v. *Administrator,* 196 Conn. 546, 550, 494 A.2d 564 (1985); we decline to interpret § 16-19h as a limitation on the general power of the DPUC to reopen rate cases not otherwise subject to § 16-19h.

Further, General Statutes § 16-9 provides in part that the DPUC "may, at any time, for cause shown, upon hearing had after notice to all parties in interest, rescind, reverse or *alter* any decision, order or authorization by it made." (Emphasis added.) This statute explicitly gives the DPUC significant discretion in deciding when and how to modify its orders. *Mazzola* v. *Southern New England Telephone Co.,* 169 Conn. 344, 366 n.20, 363 A.2d 170 (1975). Because the statute expressly permits the DPUC to modify or alter prior decisions "at any time, for cause shown," and because there is no express limitation on the power of the DPUC to reopen rate cases upon its own motion, we decline independently to restrict the power of the DPUC to reexamine utility rates in a subsequent proceeding.[7]

The plaintiffs claim, however, that even if the "Phase II" application was properly reopened, the DPUC acted contrary to law in approving it. The plaintiffs state that

[7] This decision comports with the overarching purpose of General Statutes § 16-1 et seq., to allow the DPUC to supervise and validate rates charged by the state's utilities. This clearly expressed legislative purpose could be compromised by limiting the authority of the DPUC to reconsider utility rates on its own motion.

the DPUC's first or "Phase I" decision required that only those costs associated with already completed construction be included with the "Phase II" rate application, and that when the application was reopened construction had not yet been completed. The plaintiffs also claim that the application should have been rejected because the company did not amend its application following the completion of construction pursuant to § 16-1-58 of the Regulations of Connecticut State Agencies.

Section 16-1-58 of the regulations, however, applies to the amending of a pending rate application before the DPUC has issued a decision and not to the reopening of an existing DPUC decision. The regulation is, therefore, inapplicable. Further, the first or "Phase I" decision of the DPUC stated only that the DPUC would reconsider permitting a rate increase "upon completion of the Phase II construction." Although the case was reopened before the completion of construction, the DPUC decision permitting the rate increase was not issued until after construction was completed and therefore the terms of the initial decision were met.[8]

### III

The plaintiffs' final claim is that the DPUC failed to give the town of Greenwich notice of the 1986 hearing at which the company was given permission to purchase the failing Lebanon Water Company. Pursuant to the DPUC order, the Lebanon company was merged into the Mystic district. As a result of the equalization order,

---

[8] The plaintiffs also claim that, pursuant to § 16-1-54 of the Regulations of Connecticut State Agencies, an application for a rate increase must contain data from the "most recent twelve-month period available," which was not done in this case. We conclude that because the second DPUC decision involved a reopening of an existing rate increase decision, and not an application for a new rate decision, § 16-1-54 does not apply and the plaintiffs' claim is without merit.

Greenwich is now paying some of the costs of absorbing the failing water company. The plaintiffs argue that General Statutes § 16-19[9] mandates that the DPUC provide customers with notice and an opportunity to be heard at any acquisition hearing that may adversely affect their utility rates.

The gravamen of the plaintiffs' claim is that the failure of the DPUC to give notice to Greenwich customers pursuant to § 16-19 constitutes a jurisdictional defect. Section 16-19, however, applies only to hearings involving rate increases. General Statutes §§ 16-262o through 16-262q[10] control the acquisition and disposition of fail-

---

[9] General Statutes § 16-19 provides in pertinent part: "Each public service company shall notify each customer who would be affected by the proposed amendment, by mail, at least one week prior to the public hearing thereon, that an amendment has been or will be requested. Such notice shall also indicate (1) the department of public utility control telephone number for obtaining information concerning the schedule for public hearings on the proposed amendment and (2) whether the proposed amendment would, in the company's best estimate, increase any rate or charge by twenty per cent or more, and, if so, describe in general terms any such rate or charge and the amount of the proposed increase, provided no such company shall be required to provide more than one form of the notice to each class of its customers."

[10] General Statutes § 16-262o through 16-262q provide: "Sec. 16-262o. ACQUISITION OF WATER COMPANY. RATES AND CHARGES. RECOVERY OF ACQUISITION COSTS. (a) The department of public utility control, in consultation with the department of health services, upon a determination that the costs of improvements to and the acquisition of the water company are necessary and reasonable, shall order the acquisition of the water company by the most suitable public or private entity. In making such determination, the department shall consider: (1) The geographical proximity of the acquiring entity to the water company, (2) whether the acquiring entity has the financial, managerial and technical resources to operate the water company in a reliable and efficient manner and to provide continuous, adequate service to the persons served by the company and (3) any other factors the department deems relevant. Such order shall authorize the recovery through rates of all reasonable costs of acquisition and necessary improvements. A public entity acquiring a water company beyond the boundaries of such entity may charge customers served by the acquired company for

ing water companies. Nothing in these sections requires the DPUC to notify customers in the event of such an acquisition. In the absence of an express jurisdictional notice requirement mandated by the legislature, we

water service and may, to the extent appropriate, recover through rates all reasonable costs of acquisition and necessary improvements.

"(b) Notwithstanding the provisions of any special act, the department of public utility control shall extend the franchise areas of the acquiring water company to the service area of the water company acquired pursuant to this section.

"(c) In the case of a public entity acquiring a water company beyond its boundaries, the rates charged the customers of the acquired water company shall be subject to the approval of the department of public utility control, upon petition by such customers.

"(d) On and after December 1, 1989, in the case of any proposed acquisition of a water company for which the department of public utility control has provided notice of a hearing pursuant to section 16-262n, the department may, to encourage and facilitate such acquisition, and shall, if it orders such acquisition, permit the acquiring water company to implement, and revise quarterly thereafter, a rate surcharge applied to the rates of the acquired water company or of both the acquiring water company and the acquired water company, as determined by the department, that would recover on a current basis all costs of such acquisition and of needed improvements to the acquired water company's system. Such surcharge may be designed to recover one hundred per cent of the revenues necessary to provide a net after-tax return on investment actually made in the acquisition and improvement of the acquired water company, at a rate of return equivalent to that authorized for the acquiring water company in its last general rate proceeding. The department shall, not later than December 1, 1989, adopt regulations, in accordance with chapter 54, to carry out the purposes of this section."

"Sec. 16-262p. IMPROVEMENTS BY ACQUIRING ENTITY. Any recipient of an order pursuant to section 16-262o shall make the necessary improvements to assure the availability and potability of water and the provision of water at adequate volume and pressure to the persons served by the water company. The water company shall immediately take the steps necessary for the transfer of the company to the acquiring company, municipal water authority, municipality or other public or private entity."

"Sec. 16-262q. COMPENSATION FOR ACQUISITION OF WATER COMPANY. Compensation for the acquisition of a water company pursuant to section 16-262o shall be determined by the procedures for determining compensation under section 25-42 or by agreement between the parties, provided the department of public utility control in consultation with the department of health services, after a hearing, approves such agreement."

decline to add one and conclude, therefore, that the DPUC was under no statutory obligation to provide notice to Greenwich customers.

The judgment is affirmed.

In this opinion the other justices concurred.