[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION RE: INTEREST
The plaintiff Konover Development Corporation commenced this action by writ, summons and complaint dated September 18, 1990, filed September 19, 1990, and bearing a return date of October 2, 1990 against the defendant A. James Zeller. Pursuant to the provisions of Connecticut General Statutes Section 52-192, the plaintiff filed an offer of judgment on March 5, 1992, in the amount of one million ($1,000,000.00) dollars, which offer the defendant failed to accept. Subsequently, the jury returned a verdict for the plaintiff on June 24, 1992, in the amount of $1,052,663.67. The jury also awarded statutory interest pursuant to the provisions of General Statutes Section 37-3a. That interest ran from February 22, 1990, the date the parties stipulated CT Page 7807 was appropriate.
In Connecticut, a plaintiff is entitled to prejudgment interest "on the entire award, that is, the `amount recovered.'" Gillis v. Gillis, 21 Conn. App. 549,556, cert. denied, 215 Conn. 815, 576 A.2d 544, (1990). In Gillis, the Appellate Court found plain error because the trial court did not compete prejudgment interest on the Section 37-3a interest in arriving at the amount "recovered".
 Although this is not raised as an issue on cross appeal, we find that, based upon the statutory language of Section 52-192a, it was plain error for the trial court to compute interest only on a portion of the award. See Practice Book Section 4185. `The plain language of General Statutes Section 52-192a specifies that the court shall add to the amount so recovered twelve percent annual interest on said amount. . . .' Edward Denike Tree Co., v. Butler, 21 Conn. App. 366, 573 A.2d 349
(1990). The trial court clearly did not act in accordance with the mandate of Section 52-192a when it awarded interest only on the damages portion of the award.
Id., 566.
The amount the plaintiff recovered in this action was $1,052,663.67 plus interest pursuant to General Statutes Section 37-3a. That statute provides in pertinent part:
 Rate Recoverable as Damages. Except as provided in sections 37-3b and 52-192a, interest at the rate of ten percent a year, and no more, may be recovered and allowed in civil actions or arbitration proceedings under chapter 909, including actions to recover money loaned at a greater rate, as damages for the detention of money after it becomes payable except as otherwise provided with respect to demand obligations in section 42a-3-122 (4)(a).
General Statutes Section 37-3a.
According to General Statutes Section 37-3a, the plaintiff is entitled to ten percent (10%) interest on the verdict ($1,052,633.67) from February 22, 1990, the date the money became due, until June 24, 1992, (845 days) when the jury entered its verdict. Thus, the computed amount recovered by the plaintiff is $1,296,362.52.[1]
CT Page 7808
The plaintiff is also entitled to twelve percent (12%) interest on the amount recovered ($1,296,362.52) pursuant to the provisions of General Statutes Section52-192a, which statute provides in pertinent part:
 (b) After trial the court shall examine the record to determine whether the plaintiff made an `offer of judgment' which the defendant failed to accept. If the court ascertains from the record that the plaintiff has recovered an amount equal to or greater than the sum certain stated in his `offer of judgment', the court shall add to the amount so recovered twelve per cent annual interest on said amount, competed from the date such offer was filed in actions commenced before October 1, 1981. In those actions commenced on or after October 1, 1981, the interest shall be computed from the date the complaint in the civil action was filed with the court if the `offer of judgment' was filed not later than eighteen months from the filing of such complaint. . . .
General Statutes Section 52-192a.
The plaintiff filed its offer of judgment in the amount of one million ($1,000,000.00) dollars on March 5, 1992, within eighteen months from September 19, 1990, the date upon which the action was filed, and the defendant failed to accept it. Therefore, the total amount the plaintiff is due is twelve percent (12%) interest on the amount recovered ($1,296,362.52) from September 19, 1990 to June 24, 1992, (645 days) which total amount is $1,571,262.42.[2]
Under Gillis, the plaintiff is entitled to both awards of interest because the two statutes are separate and distinct statutes, to be applied separately. Whereas interest awarded pursuant to General Statutes Section 37-3a is part of the damages recoverable for the detention of money, the award of interest pursuant to General Statutes Section 52-192a(b) is:
 [P]unitive in nature, and it is meant to serve the purpose of promoting `fair and reasonable compromise of litigation without trial. . .' This interest is mandated when the amount recovered is greater than or equal to the offer of judgment; and that amount can include interest and attorney's fees; as well as double or treble damages. (Citations omitted.) CT Page 7809
Gillis, supra, 554.
Based upon the authorities cited, the plaintiff is entitled to interest in accordance with the computation set forth and therefore the total judgment is found to be $1,571,262.42 plus costs.
PICKETT, J.
MEMORANDUM RE: MOTION TO SET ASIDE VERDICT (#117)
The defendant, A. James Zeller, has moved to set aside a verdict in favor of the plaintiff, Konover Development Corporation in the amount of $1,052,663.67 with interest from February 22, 1990. The defendant claims that the verdict is contrary to law, against the evidence and excessive.
On April 2, 1986 the plaintiff, Alan Temkin and the defendant entered into a limited partnership agreement under the name of Torringford Commercial Associates Limited Partnership for the purpose "to purchase, own, construct, repair, alter, lease, finance, refinance, sell and otherwise develop, manage and operate a certain piece or parcel of land together with all present and future improvements thereon and appurtenances thereto situated in the City of Torrington. . ." Konover was named as the general partner with Temkin a 29% limited partner and Zeller a 21% limited partner. The agreement provided in part 2. Expenses Prior to Property Acquisition:
(c) All expenses incurred by the Partnership prior to the acquisition of the Property exceeding an aggregate of Seventy-Five Thousand ($75,000.00) Dollars shall be made only upon the prior written approval of the majority of the ownership interests of the Partnership and shall be paid by funds furnished by the General Partner through the Partnership bank account(s) established in accordance with the terms and conditions of Article XIII, supra, provided, however, said payment(s) shall be deemed to be a loan from the General Partner to the Partnership as evidenced by a demand promissory note or notes from the Partnership in favor of the General Partner and bearing interest as of the date of each note, at the prime interest rate of The Connecticut Bank and Trust Company, N.A. as of said date plus one (1%) percent, to the date of payment of each note by the Partnership.
On February 6, 1988, an amendment to the limited partnership agreement CT Page 7810 was signed by Mr. Temkin and Mr. Zeller and accepted by Konover on March 8, 1988 whereby Mr. Temkin withdrew from the partnership and Mr. Zeller became the sole limited partner with a 50% interest. On November 14, 1988 the plaintiff and the defendant further amended the limited partnership agreement as follows:
 7. KDC agrees to execute an amendment to the Agreement to provide that KDC, as Managing General Partner of TCALP, can only exercise TCALP's options on the various properties which comprise the proposed Litchfield Hills Mall project in conjunction with the development of said project, it being understood and agreed that KDC will not have the right to exercise said options solely for the purpose of effectuating a liquidation of said properties if the project is deemed by KDC to be infeasible. In consideration of the foregoing, you agree to reimburse KDC, at such time as KDC determines in its sole discretion that the proposed project is no longer feasible, for any and all out-of-pocket expenses incurred by KDC with respect to the project, including but not limited to, payments to architects, engineers, attorneys, other consultants, and option payments made pursuant to the various option agreements, but exclusive of KDC's administrative costs, such as salaries and overhead. Notwithstanding the above, it is understood and agreed that you will not be obligated to reimburse KDC for its expenses associated with the possible purchase of the so-called King property, if such purchase has occurred prior to a determination by KDC that the project is no longer feasible; in lieu thereof, KDC shall have the right to reimbursement of said expenses from the proceeds of the sale of said property.
By letter dated June 13, 1989, Konover informed Mr. Zeller and he agreed by saying on August 7, 1989 that "the partnership has decided not to continue pursuing the necessary permits and approvals for the previously proposed Litchfield Hills Mall project and in the alternative, has determined to concentrate its efforts on the permits and approvals required for a retail commercial strip shopping center." The letter further provided:
 As an example, such letter would accordingly provide that Konover Development Corporation, as managing general partner of Torringford Commercial Associates Limited Partnership, can only exercise such options on behalf of Torringford Commercial Associates Limited Partnership for the purposes of developing a retail commercial strip shopping center and shall not have the right to exercise such options solely for the purposes of liquidating such properties, it being understood and agreed that if Konover Development Corporation determines that such retail commercial strip shopping center is no longer feasible, you will reimburse Konover Development Corporation for all out-of-pocket expenses incurred by it with respect to the project, as more CT Page 7811 particularly set forth in that letter.
The final amendment to the agreement was entered into on August 11, 1989 by the plaintiff and the defendant as follows:
3. The following is inserted at the end of Article VIII of the Agreement:
 4. Exercise the Partnership's rights to purchase those certain properties which comprise the proposed commercial real estate project solely for the purpose of effectuating a liquidation of said properties in the event that the General Partner deems the project to be infeasible provided however, and in consideration of such limitation, the Limited Partner agrees to reimburse the General Partner, at such time as the General Partner determines in its sole discretion that the proposed project is no longer feasible, for any and all out-of-pocket expenses incurred by the General Partner with respect to the project, including but not limited to payments to architects, engineers, attorneys, other consultants, and option payments made pursuant to the various option agreements, but exclusive of the General Partner's administrative costs, such as salaries and overhead. Notwithstanding the foregoing, it is understood and agreed that the Limited Partner shall not be obligated to reimburse the General Partner for its expenses associated with the possible purchase of the so-called King property, in the event that such purchase has occurred prior to a determination by the General Partner that the project is no longer feasible; in lieu thereof, the General Partner shall have the right to reimbursement of said expenses from the proceeds of the sale of the King property.
All during the course of the proposed project, first for a mall and later for a commercial strip, there had been considerable opposition to the project. Numerous zoning and wetland hearings were required and many appeals were filed, one of which is still pending. Based upon these difficulties Konover determined that the project was no longer feasible. It offered evidence that its decision was based upon economic conditions regarding real estate, tenant acquisition problems, and continuing delay with no end in sight to litigation. On February 21, 1990 Konover informed Mr. Zeller by telephone that it no longer considered the project feasible. This information was confirmed by letter of February 22, 1990 in which the plaintiff requested "reimbursement. . .for all out-of-pocket expenses." The defendant having refused to make payment, this lawsuit was instituted.
 I.
Contrary to Law
The defendant claims that the court erred in failing to charge in accordance with his requests of paragraph 2 of June 10, 1992,[1]
CT Page 7812 paragraph 2 of June 16, 1992,[2] paragraph 13 of June 16, 1992,[3]
and June 23, 1992.[4] As to the request to charge of June 10, 1992, that request was given verbatim with the exception of one line.
 A
Request number 2 of June 16, 1992 sought a charge on condition precedent. Initially the court notes that the defendant has failed to follow Practice Book Section 318 which provides that "when there are several requests, they shall be in separate and numbered paragraphs, each containing a single proposition of law clearly and concisely stated with the citation of authority upon which it is based, and the evidence to which the proposition would apply. . . ." Emphasis added. Colucci v. Pinette, 185 Conn. 483, 487. The defendant has failed to refer the court to any evidence regarding this request and therefore it is not in proper form. Likewise, the case cited in Ravitch v. Stollman Poultry Farms, Inc., 165 Conn. 135 does not apply. "A party cannot recover on a contract unless he has fully performed his obligations under it, has tendered performance, or has some legal excuse for not performing." Ravitch, 149. There was no evidence that Konover had not fully performed under the contract up to the time it determined the project not to be feasible.
 B
Request number 13 concerns approval by Mr. Zeller of expenditures. This request also does not conform to Practice Book Section 318 since it does not refer to evidence or contain any legal authority. Likewise, while the original agreement of April 2, 1986 required prior written approval of all expenditures in excess of $75,000.00, the amendment of November 14, 1988 eliminated that requirement. Paragraph 10 of that amendment provided that, "this letter serves to document your authorization. . .for TCALP to expend more than seventy-five thousand dollars ($75,000.00) in support of the project."
 C
The request to charge of June 23, 1992 concerns the burden of proof to a fiduciary to require proof by either clear and convincing evidence, clear and satisfactory evidence or clear, convincing and unequivocal evidence. Again, while citing proper legal authority for the basic proposition, namely, Dunham v. Dunham, 204 Conn. 303, the defendant has failed to set forth the evidence to apply to the proposition. Colucci, supra.
The question arises as to whether the defendant claims that the plaintiff must establish by clear and convincing evidence that its determination of non feasibility had to be made by that standards must the jury determine by that standard that the decision was proper or both. The court charged as set forth in Appendix A, including the statement requested by the defendant, that "a trustee in his administration of CT Page 7813 the trust is under the duty of acting exclusively and solely in the interest of the trust estate of the beneficiaries, within the terms of the trust, and is not to act in his own best interest." The court is of the opinion that its charge properly set forth the guiding legal principles for the benefit of the jury.
 D
The defendant's final claim concerning the charge is in regard to the right of the plaintiff to terminate the contract. The court charged as follows:
 There is a principal of law that a general partner owes a limited partner a fiduciary duty. The term "fiduciary duty" means that the partners owe one another a duty of the utmost good faith, fairness and loyalty. The courts have considered a limited number of circumstances where a general partner is in breach of its fiduciary duty to a limited partner. These circumstances have included violation of a statute, a threat of baseless litigation or assertion of a questionable claim, self dealing by the general partner and appropriation of the partnership's business opportunities.
 Notwithstanding the existence of a fiduciary duty as a general proposition, a general partner and limited partner can bargain for whatever terms they want in a contract as long as they are not illegal or against public policy. The exercise by the plaintiff of a contractual right it bargained for and obtained would not be a breach of its duty under the contract provided the decision was made reasonably based upon a careful review of the relevant information the general partner had before it.
 I am therefore instructing you that there is nothing against public policy for an agreement to give the general partner sole discretion to terminate its involvement in the project. Here, if you find that the agreement was that the plaintiff had sole discretion to terminate the project and exercised that discretion, reasonably you would find that the plaintiff did not violate its fiduciary duty.
 If you find that Konover was incorrect in its decision that the project was not feasible, and that indeed it was feasible, then Konover could not recover on its claim and you would decide for the defendant. In other words if you find that Konover should not have abandoned the property at the time it did, it cannot recover on its claim against the defendant and if you find so, you must find against the plaintiff.
The instruction given by the court was in accord with established legal principles. It is the general rule. . .that competent persons shall CT Page 7814 have the utmost liberty of contracting and that their agreements voluntarily and fairly made shall be held valid and enforced in the courts." Twin City Pipe Line Co. v. Harding Glass Co., 283 U.S. 353, 356, 51 S.Ct. 476,75 L.Ed. 1112 (1931);see Collins v. Sears, Roebuck Co., 164 Conn. 369,376-77, 321 A.2d 444 (1973); Real Estate Listing Service, Inc. v. Real Estate Commission, 179 Conn. 128, 138,
 E
On June 24, 1992, the plaintiff's attorney, fulfilling the high degree of ethical standards of an attorney, brought to the attention of appearing counsel and the court information regarding a conversation one of the jurors had with an unrelated party to the case. This information indicated that the juror may have formed an opinion and reached a decision prior to the conclusion of the evidence and receiving instructions from the court. At this time, the case had been submitted to the jury the previous day and the alternates excused. The court conducted a hearing in chambers in the presence of the defendant and both attorneys, concluded that the juror was not disqualified and denied the defendant's motion for non suit and/or mistrial. Appendix C.
The defendant's motion claimed that one member of the jury expressed an opinion, from which the defendant inferred that the jury had decided the case prior to the argument and charge.
The threshold determination in a civil case in which juror misconduct is claimed is whether the misconduct was occasioned by the prevailing party. Klingeman v. MacKay, 25 Conn. App. 217, 219 (1991). If the misconduct is not brought about by the prevailing party, then the burden is on the complainant to show prejudice. Williams v. Salamone, 192 Conn. 116, 121
(1984). In the present case, since the prevailing party did not cause the alleged misconduct, the defendant bore the burden to show how he was prejudiced by the juror's conduct.
The standard for analyzing juror misconduct, as enunciated by our Supreme Court, is the "probable prejudice" test: "`whether the misbehavior is such to make it probable that the juror's mind was influenced by it so as to render him or her an unfair and prejudicial juror,'" Williams v. Salamone, supra, 122, quoting the trial court below. Unless the trial court concludes from the evidentiary hearing that the defendant has sustained its burden that he was denied a fair trial, his motion must be denied. Speed v. DeLibero, 215 Conn. 308, 313 (1990); Klingeman v. MacKay, supra, 221. Furthermore, the trial court has wide discretion in deciding mistrial motions.
The issue of juror misconduct is not new, nor does misconduct, per se, require a mistrial. Hamill v. Neikind, 171 Conn. 357, 360 (1976). "To deprive a party of a verdict, which he may have honestly obtained, after a protracted and expensive litigation, merely because a juror may have improperly spoken. . .when he could have received no benefit from that CT Page 7815 act of the juror, and his opponent no injury, would seem hardly compatible with a due administration of justice." Pettibone v. Phelps, 13 Conn. 445,450 (1840).
Many cases have reached consistent results in upholding denials of new trial motions. See Bernier v. National Fence Co, 176 Conn. 622 (1979), where one juror read an article in local newspaper concerning the trial revealing facts not before the jury; Bluett v. Eli Skating Club, 133 Conn. 99
(1946) where derogatory racial remarks made by a juror concerning the race to which one of the jurors and counsel for the plaintiff belonged; Genuario v. Finkler, 136 Conn. 500, 503 (1950) where one juror had a conversation with certain persons who were not members of the jury; Klingeman v. MacKay, supra, where the jury found to have referred to dictionary definition of "proximate cause;" one juror also found to have reduced his thoughts to writing and submitted this to the other jurors.
After responding to two questions from the jury, the court gave a cautionary instruction regarding the duty of the jury to decide the case fairly, based upon the law and the evidence. See Appendix D. The court is satisfied that there was no juror misconduct and that the jury performed its duty in accordance with the law.
 II
Against the Evidence.
The defendant claims that expenses paid after November 14, 1988 were not justified since not approved in writing and that construction of the shopping center was feasible. The first claim has been rejected in Part I B of this memorandum. The amendment of paragraph 10 authorizing expenditures in excess of $75,000.00 eliminated the requirement of prior approval in the original agreement of April 2, 1986.
The second claim was dealt with in Part I D of this memorandum. The issue of feasibility was presented to the jury as an issue of fact. There was evidence of market conditions, tenant availability and economic hardship by reason of continuing delay due to litigation. It is for the jury to determine questions of fact, Giglio v. Connecticut Light Power Co.,180 Conn. 230, 235, and to determine the weight of the evidence. Kubeck v. Foremost Food Co., 179 Conn. 486, 487. For the reasons set forth the motion to set aside the verdict is denied.
PICKETT, J.
APPENDIX A
The plaintiff's claim is based upon rights acquired for the first time in the November 14, 1988 letter agreement which gave it the sole discretion to determine whether or not the project was feasible. That same understanding is reflected by the third amendment, dated August 11, 1989.
Feasible is defined as capable of being done, executed or effected, capable of being managed, utilized or dealt with successfully.
To be feasible is to be capable of being successfully done or accomplished.
It is for you to decide whether the project was feasible as I have defined that word to you at the time the plaintiff made its decision. It must make the decision as a fiduciary and not simply as a businessman dealing with another businessman.
The plaintiff is a General Partner and owes a fiduciary duty to its Limited Partner. This is true since it has complete authority to deal with the partnership business. A fiduciary is a person holding the character of a trustee, or a character analogous to that of a trustee, in respect to the trust and confidence involved in it and scrupulous good faith and candor which it requires. Albom v. Katz, 39 Conn. Sup. 533,534-536 (1983). A trustee must act in good faith in the administration of the trust, and this requirement means that he must act honestly and with finest and undivided loyalty to the trust, not merely with that standard of honor required of men dealing at arm's length in the workaday world, but with a punctilio of honor the most sensitive. 76 Am.Jur.2d, Section 315, page 534.
A trustee in his administration of the trust is under the duty of acting exclusively and solely in the interest of the trust estate or the beneficiaries, within the terms of the trust, and is not to act in his own best interest. The Plaintiff claims that it no longer was required to perform because it found the project no longer feasible. Such a decision must be evaluated by you, with the understanding that the Plaintiff was a fiduciary and thus owed the duty to the Plaintiff that I have explained to you.
In order for performance to be excused on the ground of infeasibility or impracticability, the party claiming that performance should be excused must show that:
1. The (supervening) event made the performance impracticable; CT Page 7818
2. The nonoccurrence of the event was a basic assumption on which the contract was made;
3. The impracticability resulted without the fault of the party seeking to be excused; and
4. The party has not assumed a greater obligation that the law imposes.
APPENDIX B
(In Chambers)
(Jason Bannerman was escorted into Judge's Chambers)
THE COURT: Have a seat. A matter has come to my attention that I have to ask you a couple of questions.
You recall that I instructed the jury as to wait until you have heard all the evidence and arguments of counsel and the court's charge before making up your mind. It has come to my attention there may have been a conversation you had with someone, I gather, in West Hartford, in that area, during the course of the trial. Is that true?
MR. BANNERMAN: In West Hartford?
THE COURT: Well, Where would it have been? A trainer acquainted with Mr. Cohen?
MR. BANNERMAN: A personal trainer that I know.
THE COURT: You had a conversation with him about the trial?
MR. BANNERMAN: Yes, I did.
THE COURT: And did you indicate how you thought the trial was going?
MR. BANNERMAN: I didn't indicate what the outcome would be, because I don't know. I just indicated what my opinion was.
THE COURT: In other words, have you made up your mind as to how the case was going on?
MR. BANNERMAN: Not at all. My mind is still not made up. CT Page 7819
THE COURT: You still consider yourself a free person?
MR. BANNERMAN: Definitely.
THE COURT: You have no prejudged the case?
MR. BANNERMAN: Not at all.
THE COURT: Let me ask you this question. I may not have the quotation correct. But did you indicate to this person it looks like an open and shut case?
MR. BANNERMAN: No. I never said that.
THE COURT: Did you say, well, the defendant signed the agreement, so there is no question?
MR. BANNERMAN: I didn't say that either. I said — I didn't say anything like that or even sounded like that.
THE COURT: You consider yourself open-minded about this case at the present time?
MR. BANNERMAN: Definitely.
THE COURT: You feel you can decide it fairly for both side?
MR. BANNERMAN: Yes.
THE COURT: As you sit here at the present moment, would you be able to vote whether for the plaintiff or the defendant at this time?
MR. BANNERMAN: To vote for either?
THE COURT: At this moment, if you made up your mind as you sit here now.
MR. BANNERMAN: Yes.
THE COURT: You have made up your mind?
MR. BANNERMAN: No, I thought with them. No, not right now, I cannot.
THE COURT: Right now you cannot?
MR. BANNERMAN: No. CT Page 7820
THE COURT: Let me ask you one further question which is on a different subject.
It also came to my attention that some of the jurors, I don't know if you were involved or not, were conferring with, or talking rather — I won't say conferring — talking to the alternates last night. Did you discuss the case with the alternated?
MR. BANNERMAN: No, I left.
THE COURT: All right. Thank you. You may return to the jury room.
MR. BANNERMAN: All right.
(Mr. Bannerman returns to the deliberation room)
MR. McNAMARA: Your Honor, I think —
THE COURT: You want this on the record or off?
MR. McNAMARA: Off.
(An off-the-record discussion was had)
(Donna Gay was escorted into Judge's Chambers)
APPENDIX C
(In Chambers)
(Jason Bannerman was escorted into Judge's Chambers)
THE COURT: Have a seat. A matter has come to my attention that I have to ask you a couple of questions.
You recall that I instructed the jury as to wait until you have heard all the evidence and arguments of counsel and the court's charge before making up your mind. It has come to my attention there may have been a conversation you had with someone, I gather, in West Hartford, in that area, during the course of the trial. Is that true?
MR. BANNERMAN: In West Hartford?
THE COURT: Well, Where would it have been? A trainer acquainted with Mr. Cohen? CT Page 7821
MR. BANNERMAN: A personal trainer that I know.
THE COURT: You had a conversation with him about the trial?
MR. BANNERMAN: Yes, I did.
THE COURT: And did you indicate how you thought the trial was going?
MR. BANNERMAN: I didn't indicate what the outcome would be, because I don't know. I just indicated what my opinion was.
THE COURT: In other words, have you made up your mind as to how the case was going on?
MR. BANNERMAN: Not at all. My mind is still not made up.
THE COURT: You still consider yourself a free person?
MR. BANNERMAN: Definitely.
THE COURT: You have no prejudged the case?
MR. BANNERMAN: Not at all.
THE COURT: Let me ask you this question. I may not have the quotation correct. But did you indicate to this person it looks like an open and shut case?
MR. BANNERMAN: No. I never said that.
THE COURT: Did you say, well, the defendant signed the agreement, so there is no question?
MR. BANNERMAN: I didn't say that either. I said — I didn't say anything like that or even sounded like that.
THE COURT: You consider yourself open-minded about this case at the present time?
MR. BANNERMAN: Definitely.
THE COURT: You feel you can decide it fairly for both side?
MR. BANNERMAN: Yes. CT Page 7822
THE COURT: As you sit here at the present moment, would you be able to vote whether for the plaintiff or the defendant at this time?
MR. BANNERMAN: To vote for either?
THE COURT: At this moment, if you made up your mind as you sit here now.
MR. BANNERMAN: Yes.
THE COURT: You have made up your mind?
MR. BANNERMAN: No, I thought with them. No, not right now, I cannot.
THE COURT: Right now you cannot?
MR. BANNERMAN: No.
THE COURT: Let me ask you one further question which is on a different subject.
It also came to my attention that some of the jurors, I don't know if you were involved or not, were conferring with, or talking rather — I won't say conferring — talking to the alternates last night. Did you discuss the case with the alternated?
MR. BANNERMAN: No, I left.
THE COURT: All right. Thank you. You may return to the jury room.
MR. BANNERMAN: All right.
(Mr. Bannerman returns to the deliberation room)
MR. McNAMARA: Your Honor, I think —
THE COURT: You want this on the record or off?
MR. McNAMARA: Off.
(An off-the-record discussion was had)
(Donna Gay was escorted into Judge's Chambers)
APPENDIX D CT Page 7823
THE COURT: Now finally, I want to at this point remind you of something I am sure is on your minds. And that is the oath that you took when you were sworn to hear this case. And that is that you solemnly swear you will well and truly try the issue or issues now to be given to you in charge between the plaintiff and defendant, according to the evidence given you in court, and the laws of this state, and accordingly a true verdict give, your own counsel and your fellows you will duly observed and keep, you will speak nothing to anyone of the business or matters you have in hand, but among yourselves, nor will you suffer anyone to speak to you about the same, but in court. When you agree upon any verdict, you will keep it secret until you deliver it up in court, so help you God.
Now as I informed you earlier, you should not speak to anyone. It has come to my attention that some of you may have had a conversation with one or two of the alternates. I am not suggesting you violated your oath. But I must remind you you must decide this case, based upon the evidence you heard in court and the law.
As I instructed you in my charge, you will render your verdict in favor of the plaintiff or the defendant in fairness to all in accordance with your oath. Your verdict must not be influenced by sympathy. You must considerately, with you minds unswerved from your duty, determine the verdict and give careful consideration to the facts disclosed by the evidence and the application of law thereto.
The plaintiff and the defendant justly rely or you to consider carefully the claims, to evaluate all the evidence and to render a verdict based or the facts and the law and rightfully expect fair and just treatment at your hands.
I am not criticizing you, ladies and gentleman. I just want to remind you that is your duty.
You may now retire.
(Jury was excused at twelve o'clock noon) CT Page 7824