[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an appeal by the Commission on Human Rights and Opportunities (hereinafter referred to as Commission) from a decision of a Hearing Officer ruling in favor of the defendant General Dynamics Corporation Electric Boat Division (hereinafter referred to as EB) on a complaint filed by Samuel Tucker which complaint alleged discrimination in hiring by EB. The Commission claims that the Hearing Officer erred in failing to find that a prima facie case of discrimination had been established.
The following facts were found by the Hearing Officer:
1. By stipulation, all jurisdictional and procedural matters relative to certification of this complaint have been met and the hearing is properly before the hearing officer.
2. On or about, November 14, 1985, Tucker applied for employment as a Carpenter at Electric Boat.
3. On December 9, 1985, Electric Boat hired Tucker as a Carpenter SSSA (Semi-skilled, Step A), subject to him passing a physical examination before beginning work.
4. On December 3, 1985, Tucker had the physical examination. Pursuant to the exam, he completed a medical CT Page 9853 questionnaire.
5. In general, applicants for jobs at Electric Boat are given "pre-placement" physical examinations to determine whether the applicant can perform the required job functions for which he is hired.
6. On the medical questionnaire, Question #36 asked the question, "Do you have, or have you had, any injury, illness of condition that might interfere with any type of work?" Tucker answered this by writing, "Clustrifobia (sic)."
7. Tucker answered Question 36 this way because he thought he might have been claustrophobia as a result of a prior incident where he became anxious after being stuck under a sink while doing repair work.
8. After completing the medical questionnaire, Tucker was examined by a physician's assistant, Geoff Burnham, at Electric Boat's medical office.
9. Dr. Kent, a physician employed by Electric Boat at the time of the complaint, recommended that Tucker consult with a psychiatrist of psychologist to have the apparent problem with claustrophobia evaluated.
10. Dr. Kent did not diagnose Tucker as having claustrophobia.
11. On December 5, 1985, Tucker was examined at Dr. Ruffner's office.
12. In Dr. Ruffner's office, Tucker was examined by a social worker, Mr. Anger, who had rendered pre-employment evaluation diagnoses a total of three times.
13. Dr. Ruffner did not have any substantial discussions with Tucker about having claustrophobia.
14. Dr. Ruffner's knowledge about Tucker's medical condition concerning claustrophobia was derived from Mr. Anger.
15. By letter report dated December 9, 1985, Dr. Ruffner wrote that it appeared that Tucker did not suffer from claustrophobia.
16. Dr. Kent received Dr. Ruffner's letter report.
17. "Claustrophobia" is listed in the Diagnostic and Statistical Manual of the American Psychiatric Association. CT Page 9854 ("DSM III")
18. The DSM III includes the criteria to make the definitive diagnosis of all types of mental disorder and other types of conditions.
19. On December 12, 1985, Dr. Kent decided that Tucker could work but restricted his employment activities to those areas that were not in "tight or confined spaces."
20. Dr. Kent restricted Tucker's work activities because of the following reasons: that Tucker stated he had claustrophobia; that Tucker reiterated this claim to his physician's assistant, Geoff Burnham; that Dr. Ruffner's letter was not unequivocal in ruling out that Tucker did not have claustrophobia; and that he was concerned about the safety of Electric Boat workers who might have to work alongside Tucker on the job.
21. There are certain areas in the yard in which people occasionally have to work in tight or confined spaces.
22. Dr. Kent's decision to restrict Tucker's work activities was not a placement decision; rather, it was to prevent him from being assigned to areas where he would have to work in tight or confined spaces.
23. Between 85% to 90% of carpenter work is performed inside submarines.
24. Much of the work carpenters perform on submarines involves being in tight or confined spaces.
25. Audrey Scott, Supervisor of Shipyard and Clerical Placement, attempted to find work for Tucker in light of his restricted work status but no positions were available.
26. Eugene Lajoie, presently a Superintendent of Carpenters who has worked at EB for approximately 37 years, testified that a person who had work restrictions like Tuckers' could not realistically work on submarines.
STANDARD OF REVIEW
In discussing the standard of judicial review of an administrative agency ruling the court in Board of Education v. Commission on Human Rights and Opportunities, 176 Conn. 533,538-39, 409 A.2d 1013 (1979) stated in part as follows: CT Page 9855
 "(t)he findings of the hearing tribunal . . . if supported by substantial and competent evidence, shall be conclusive." General Statutes Section 31-128(b). "Substantial and competent evidence is that which carries conviction. It is such evidence as a reasonable mind might accept as adequate to more than a mere scintilla and must do more than create a suspicion of the existence of the fact to be established." Corey v. Avco-Lycoming Division, 163 Conn. 309, 322, 307 A.2d 155 (1972), cert. denied, 409 U.S. 1116, 93 S.Ct. 903, 34 L.Ed.2d 699
(1973); See International Brotherhood of Electrical Workers v. Commission on Civil Rights, 140 Conn. 537, 543-44, 102 A.2d 366
(1953). The court is thus limited to determining whether the tribunal's findings were supported by "substantial and competent evidence," and whether the tribunal exceeded its authority. General Statutes Section 4-183(g). The court cannot try the case de novo, adjudicate the facts, or substitute its own discretion for that of the tribunal. Norwich v. Norwich Fire Fighters, 173 Conn. 210, 214 377 A.2d 290 81977); International Brotherhood of Electrical Workers v. Commission on Civil Rights, supra, 544-45.
Section 46a-95(h) provides that "the findings of the presiding officer as to facts, if supported by substantial and competent evidence, shall be conclusive."
The Commission has the right to appeal by virtue of Section 46a-94a that provides in part as follows:
 The Commission on Human Rights and Opportunities, any respondent or any complainant aggrieved by a final order of a presiding officer . . . may appeal therefrom in accordance with Section 4-183.
The Hearing Officer rendered the following conclusion:
Conclusion
 On the basis of the record and all of the evidence adduced at trial, it is ruled that Tucker failed to meet his prima facie case of discrimination under McDonnell. All CT Page 9856 elements of the McDonnell test have not been proven by a preponderance of the evidence. It is thus unnecessary to proceed with the remaining portions of the McDonnell standard of review.
The claim of Mr. Tucker is that he was unlawfully discriminated against on the basis of a perceived mental disorder or physical disability in violation of Section46a-60(a)(1), which provides in part as follows:
 Section 46a-6 — Discriminatory employment practices prohibited.
 (a) It shall be a discriminatory practice in violation of this section.
 (1) For an employer, by himself or his agent, except in the case of a bona fide occupational qualification or need, to refuse to hire or employ or to bar or to discharges from employment any individual or to discriminate against him in compensation or in terms, conditions or privileges of employment because of the individual's race, color, religious creed, age sex, marital status, national origin, ancestry, present or past history of mental disorder, mental retardation learning disability or physical disability, including, but not limited to, blindness;
The present appeal was filed by the Commission on its own behalf as a party and on behalf of Mr. Tucker. EB does not dispute the fact that both the Commission and Tucker are aggrieved parties and have the right to appeal.
Many of the other facts that give rise to this appeal are not disputed.
A. On or about February 13, 1986, Samuel Tucker filed a complaint with the Commission on Human Rights and Opportunities, charging the defendant with employment discrimination.
B. In his complaint, Samuel Tucker charged the defendant with disqualifying him from employment because the defendant perceived him to have a mental disorder or physical disability, namely, claustrophobia. CT Page 9857
C. In the alternative, Mr. Tucker, in his complaint, charged that, even if he did have claustrophobia, the condition was so mild as to not prevent him from working in confined areas.
D. Mr. Tucker alleged in his complaint that the above noted actions of the defendant violated Section 46a-60(a)(1) of the general statutes.
E. Pursuant to CONN. GEN. STAT. Sections 46a-83(a), Mr. Tucker's complaint was investigated by a Commission investigator, who found reasonable cause for believing that a discriminatory practice had occurred.
F. Following a failure of conciliation endeavors, Mr. Tucker's complaint was certified to a public hearing, pursuant to Section 46a-84(a) of the general statutes.
G. Pursuant to CONN. GEN. STAT. Section 46a-84(b), a hearing officer was appointed to hear the complaint.
H. Pre-hearing conferences were held on March 7 and May 9, 1990.
I. The defendant filed a Motion to Strike, which was denied by the Hearing Officer in a written memorandum dated May 6, 1990.
J. Hearings were held on June 7 and 8, 1990.
K. The hearing officer rendered a decision, dated November 23, 1990, which was mailed to the parties on November 29, 1990.
The following three claims are raised by the Commission:
1. A perceived disability is protected by discrimination under Section 46a-60(1),
2. The Hearing Officer erred in finding that EB did not perceive Mr. Tucker to have a disability, and
3. The Hearing Officer used an improper legal analysis.
These claims will be discussed seriatim.
I. THE COMMISSIONER'S CLAIM THAT A PERCEIVED DISABILITY IS PROTECTED FROM DISCRIMINATION UNDER SECTION CT Page 985846a-60(a)(1).
The Standard of Judicial Review of this claim as it relates to an administrative agency ruling is based on the holding in State Medical Society v. Board of Examiners of Podiatry, 208 Conn. 709, 717 (1988) where the court stated in part as follows:
 On the other hand, it is the function of the courts to expound and apply governing principles of law. N.L.R.B. v. Brown, 380 U.S. 278, 291, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965); International Brotherhood of Electrical Workers v. N.L.R.B., 487 F.2d 1143, 1170-71 (D.C. Cir. 1973), aff'd sub nom. Florida Power Light Co. v. International Brotherhood of Electrical Workers, 417 U.S. 790, 94 S.Ct. 2737, 41 L.Ed.2d 477 (1974); Connecticut Hospital Assn., Inc. v. Commission on Hospitals 
Health Care, supra; Real Estate Listing Service, Inc, v. Real Estate Commission, 179 Conn. 128, 138-39, 425 A.2d 581 (1979). This case presents a question of law turning upon the interpretation of a statute. See Branigan v. Administrator, 139 Conn. 572, 577, 95 A.2d 798 (1953); Bridgeport v. United Illuminating Co., 131 Conn. 368, 371, 40 A.2d 272 (1944). Both the board and the trial court had to construe Section 20-50 to determine the permissible scope of podiatry practice in Connecticut. In our view, this is purely a question of law, requiring that the intent of the legislature be discerned. Such a question invokes a broader standard of review than is ordinarily involved in deciding whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally or in abuse of its discretion. Robinson v. Employment Security Board of Review, 181 Conn. 1, 5, 434 A.2d 293 (1980).
The policy in Connecticut regarding discrimination is found in part in Evening Sentinel v. National Organization for Women, 168 Conn. 26, 357 A.2d 498 (1975) and Quinnipiac Council, Boy Scouts of America, Inc. v. CHRO, 204 Conn. 2897 (1987). As stated by the court in Evening Sentinel, supra, 35, the purpose of the statute prohibiting discriminatory employment practices is "to prohibit acts, not status. It is part of a policy to CT Page 9859 eliminate . . . discrimination in its subtle as well as overt forms. The very act of classifying individuals by means of criteria irrelevant to the ultimate end sought to be accomplished operates in a discriminatory manner. Such discrimination is destructive to society as a whole in that is eliminates a class of individuals who otherwise could have made vital and fresh contributions." As stated in Quinnipiac Council, supra, 300:
 All of our antidiscrimination law is essentially fact-bound. As the Supreme Court of the United States has frequently reminded us, and as we have repeatedly stated in our own opinions, the individual is the focal point of the legislation that defines and prohibits discriminatory practices. The purpose of antidiscrimination legislation is to afford access to opportunity on the basis of individual abilities rather than on the basis of stereotypical generalizations. Los Angeles Department of Water Power v. Manhart, 435 U.S. 702, 708, 98, S.Ct. 1370, 55 L.Ed.2d 657 (1978); Wroblewski v. Lexington Gardens, Inc., 188 Conn. 44, 59, 448 A.2d 801 (1982); Connecticut Institute for the Blind v. Commission on Human Rights Opportunities, 176 Conn. 88, 96, 405 A.2d 618 (1978); Evening Sentinel v. National Organization for Women, supra, 35. In considering the opportunity of which an individual claims to have been deprived, the focus is equally on the particular, rather than on access to an organization or an industry as a whole. Trans Worlds Airlines, Inc. v. Thurston, 469 U.S. 111, 122-23, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985). . . .
This court agrees with the rationale followed in the state of Wisconsin in Dairy Equipment Company v. Department of Industry, Etc., Wis., 290 N.W.2d 330 (1980) and the state of New Jersey's approach found in Rogers v. Campbell Foundry Co., N.J. Super. A.D., 447 A.2d 589 regarding perceived handicaps. In Dairy Equipment, supra, the court at page 335 stated in part as follows:
 It is with this purpose in mind that we must determine whether the respondent in this case qualifies as handicapped within the meaning and intent of the Act. CT Page 9860
 In this case the circuit court ruled that the respondent (having only one kidney) was handicapped because he had ". . . a perceived sensitivity to injury in the future." We agree with the trial court's conclusion. It would be both ironic and insidious if the legislative intent in providing the protection of the Fair Employment Act were afforded to persons who actually have a handicap that makes "achievement unusually difficult" or limits their capacity to work, but the same protection is denied to those whom employers perceive as being handicapped. Congress recognized this situation and it included within the definition of the term "handicapped individuals" persons who are regarded as having an impairment:
 ". . . any person who (A) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (B) has a record of such an impairment, or (C) is regarded as having such an impairment." (emphasis supplied). Rehabilitation Act of 1973, 29 U.S.C. § 706(6) (1976).
In Rogers, supra, page 591 the court stated in part as follows:
 The cases cited stand for the rule that those perceived as suffering from a particular handicap are as much within the protected class as those who are actually handicapped. In Barnes v. Washington Natural Gas Co., supra, the court put it thus:
 It would defeat legislative purpose to limit the handicap provisions of the law against discrimination to those who are actually afflicted with a handicap, such as epilepsy, and exclude from its provision those perceived as having such a condition . . . The law's application, therefore, should not be limited to those who actually have handicaps, excluding those who are discriminated against in the same way became they are only thought to have CT Page 9861 handicaps. (591 P.2d at 465)
This court agrees with the holdings in Dairy Equipment Co. and Rogers and accordingly finds that a person perceived as suffering from a particular handicap falls within the protection of Section 46a-60(a)(1).
II. THE COMMISSIONER'S CLAIM THAT THE HEARING OFFICER ERRED IN FINDING THAT EB DID NOT PERCEIVE MR. TUCKER TO HAVE A DISABILITY.
The discussion of the Hearing Officer on this issue is in part as follows:
 Again, based on the record and the evidence presented at trial, it is concluded that Electric Boat's decision was reasonable under the circumstances. Hence, the employer could not have "perceived" Tucker to have a medical condition that was the basis for inferring any type of discriminatory motive or intent . . . .
 It cannot be concluded, therefore, that EB made this decision on the basis of a perceived condition that was discriminatory in nature. Hence, for all of the above reasons, Tucker is not construed to be a member of a protected class since he did not prove by a preponderance of the evidence that he suffered from a mental disorder or physical disability, either in fact or via a perception.
The question before the court is whether this finding is supported by substantial and competent evidence.
The following portions of the transcript from testimony of Dr. Kent are relevant to this issue:
 MR. LEHR: So if I could summarize to make sure that I understand, there is all kind of medical experts out there. Neurologists, psychiatrists, heart doctors, lung doctors, orthopedists and generally speaking what you is you when necessary and appropriate you get their special expertise and input and then you take the data from input and use our own expertise as a occupational practitioner and CT Page 9862 apply that data to the extent you find it creditable and worthy of deference, to the work place and make a match?
 THE WITNESS: That in the essence is the job of a occupational health physician.
 Q So that if I go to a doctor and he tells me that I've got a broken arm and I come back with you and he describes the nature of my broken arm, then you make an assessment based on the fact that I've got a broken arm what I can do with that broken arm in the work place?
A That's right.
 HEARING OFFICER BANKS: Okay, got ya. the one that says you can work with —
 A B says that he can work with restrictions.
HEARING OFFICER BANKS: Okay, got ya.
 A I made another comment — I made my statement I said, "I still feel we will have problems if this individual is assigned work in tight/confined spaces. I am making him a B as okay to hire, if can utilize under the restrictions of no work in tight/confined spaces." And I signed it.
 Q Thank you, Doctor. So let's make sure the record is clear and I understand, you were not saying we couldn't hire him, we just couldn't place him in a job that involved work in tight/confined spaces?
A Exactly.
Q Okay. And you made a note that day?
 A And I made a note that day and I said, "My recommendation is unchanged. Okay, for hire, if can be assigned work in his trade in a non-confined type space.
 Q Dr., did you when you placed those restrictions on Mr. Tucker perceive Mr. CT Page 9863 Tucker to be claustrophobic?
 A I did not make a diagnosis on him, so I did not conceive him as —
HEARING OFFICER BANKS: Attorney Lehr
 A As carrying the diagnosis of claustrophobia.
 Q What is a difference in your opinion, sir, if any between placing restrictions on someone and engaging in a diagnosis?
A Two entirely different processes.
 Q It may be clear to you and I can tell by your answer.
 A One is the process of making a diagnosis from a medical standpoint requiring A + B + C + D = diagnosis. Whereas perceive an employment as a individual who shouldn't be doing this kind of a job in the work place. For, instance, we could take it and perceive it with heart disease for instance. If I have an individual that I may not have all the information at hand that he has a subaortic stenosis because I don't have all the diagnostic material. So therefore I have not made a diagnosis.
 However, I perceive that this individual has a pulmonary function test that shows that he has only 50% of his vital capacity. Or that he has a chest xray that has a heart that's three time the size of normal and that when I walk him up and down the hall he gets short of breath when he walks down 50 feet. I can easily without making a diagnosis say this individual, if we're going to hire him must be place in a position where he does not have to do any prolonged walking, prolonged standing, cannot lift over 25 pounds, has to have certain restrictions placed upon him, without establishing a medical diagnosis.
Q And I am correct in understanding that CT Page 9864 you did not make a medical diagnosis in this case?
A Did not make a medical diagnosis.
 Q And just for the record so we're absolutely clear, would you again summarize the basis upon which you relied in imposing the restrictions that you did?
 A Number one, his coming ahead with his statement and saying he was claustrophobic. So that he questioned something about himself that might have interfered with his job. Number two, his reiterating the same to the medical health professional who did his exam, my physician's associate.
Q Mr. Jeff Burnam?
 A Right. Number three, the equivocation in the evaluation that we received from the psychiatrist as to equivocation of whether he did or did not have the condition. The fact that I felt as medical director, it was my responsibility to be safe in the hiring of this individual, both considering he as an employee, considering his fellow employees. Both so far as their safety, plus also my other responsibility which I have always had as a physician in occupational medicine, the company.
 It was only safe at that time because of all of these creditability issues, because of the problem of what we had in the ship yard as a basic type of work that we had. It was only safe at that time for me after very much thought, and as I said it took me several day to make this final decision. The only safe decision to say I felt it was not correct to hire this employee and place him into the types of conditions that I felt would be unsafe. (emphasis provided)
 Q Okay. Doctor, I have a couple of questions in my own mind. The way I interpret your testimony as far as I see it is that given the input that you have and CT Page 9865 your evaluation of this patient, you made a determination, essentially a judgment that it was better to ere on the side of the safety and say that he should not work in tight or confined places, without the benefit of a diagnosis of claustrophobia. Because you felt that you didn't need to make one, right? You just felt it was better to say that he should not be placing himself or others in jeopardy because it might hurt other people, based on the information that you had.
A And him.
 Q But you did not make a diagnosis of claustrophobia —
A Right.
 Q Because you felt you did not need to make one. My question really is, is it better medical practice, and I don't know, to make the next step and to find out if he really did have claustrophobia, to make a better decision?
 MR. LEHR: I don't have any problem. with that question. I'd just like to state for the record that I don't know that we have a duty to do that and our position is once he raises claustrophobia, I understand Dr. Kent's testimony to be basically, it was then the duty of the employees to satisfy us that he did not. And that he had the burden at that point to satisfy —
 HEARING OFFICER BANKS: I don't know. That could absolutely be true. But this goes to weight and I just don't know. Could you tell me — I mean why wasn't this, why wasn't this person evaluated by somebody, whether it be you or somebody else in terms of claustrophobia?
 THE WITNESSES: I don't know how any further evaluation could be made.
A There's not — CT Page 9866
Q You said —
 A It's not like heart disease. It's not like lung disease. You can't measure it.
Q I see.
 A It basically is a statement coming of a person's mouth.
 Q I see. So when you went to make a diagnosis, would you have done anything different as opposed to getting more information or other tests?
 A There are no other tests that you can do that will — it all depend on how the question is asked and how the individual responds as to whether you say they do or do not have the disease. (emphasis provided)
 MR. LEHR: May I ask a question? I think the point that you're making, correct me if I'm wrong, is some medical problems like a broken arm lend themselves very easily to objective documentation. That is any xray.
THE WITNESS: Right.
 MR. LEHR: Is my understanding correct that with respect to claustrophobia, at least with respect to the diagnosis of it, it's very heavily laden on history provided by the patient?
THE WITNESS: A 100%.
 Q You said right a few moments ago that it was a disease. Can you explain that? Claustrophobia being a disease?
 MR. LEHR: No. I'm just going to state for the record, I'm not sure that that was his testimony. I don't believe he testified that claustrophobia was a disease. The record will state for itself.
 HEARING OFFICER BANKS: Okay. It's noted. I distinctly remembered him saying CT Page 9867 that it was a disease. Could you explain that if that's true.
 THE WITNESS: Depending on how you define that word, disease, I would — it's condition.
 Q What kind of a condition? Physical or mental or both or what? What is it?
 A Well it's both actually because the develop certain physiologic generalized symptoms related to their emotional distress. (emphasis provided)
Q Okay.
 A So that it's a — I would call it condition. I wouldn't call it a disease.
Q It's not a disease then.
A I wouldn't call it a disease.
Q Okay, fine, thank you.
A By medical definition.
Q Fine.
 MR. LEHR: For the record respondent want to state that I believe the record will reflect that he did not identify it as a disease.
 Q But if you didn't perceive him to have claustrophobia, then why these restrictions? Let me ask you this question.
 A I did not make a diagnosis of claustrophobia. (emphasis provided)
 Q I understand that, I understand that. These restrictions, no work in tight/confined spaces.
A Yes, sir.
 Q Was there some other illness or disease or condition that you thought he had CT Page 9868 that warranted these restrictions?
 THE WITNESS: I felt that it would create problems so far as the safe worker because of a potential of him having some anxiety when placed into tight/confined places in our ship yard. I did not do it on the basis of feeling that he had a disease or condition that required. (emphasis provided)
 HEARING OFFICER BANKS: So you can't attach a label to it.
 THE WITNESS: I did not place a label and I would not place a label on him. I wouldn't like to label him as having a condition.
 HEARING OFFICER BANKS: I understand now.
 THE WITNESS: I thought it was unfair to label him with a condition.
HEARING OFFICER BANKS: Understood.
 THE WITNESS: I felt it was safe to do it this way.
 MR. PECK: You indicated a concern that he might have some sort of anxiety reaction in a tight or confined space. That was your testimony just now wasn't it?
 A That would be basically it, right. (emphasis provided)
Q Well isn't —
A It was a judgment call.
 Q Isn't claustrophobia in fact maybe a more pronounced, maybe a very severe anxiety reaction to being confined in a tight space, but isn't that sort of something on the path to claustrophobia what you just noted?
 A Again, I did it without placing a diagnosis or a name to it. CT Page 9869
 Q But the possibility that he might have a reaction to being in a tight or confined space was the basis of your recommendation, wasn't it?
 A That was the basis for the recommendation for the restriction.
Q Right.
 A Right. Not because that he was suffering from a disease or a disorder.
 Q But claustrophobia in fact is the condition of acute anxiety related to being so confined; isn't it? I mean that's a layman admittedly definition.
 A If you want to make a diagnosis, but I did not make a diagnosis. I did not establish a diagnosis.
 Q Alright. Let me ask you this. Could you give us, if you know, a medical definition of claustrophobia? (emphasis provided)
 A Again I would have to get that, get the manual to give it because it's printed exactly in that manual.
 HEARING OFFICER BANKS: Do you know just generally what it is?
 THE WITNESS: Well it's a fear of tight and confined spaces, that the — but the diagnosis becomes much more worldly and — (emphasis provided)
 HEARING OFFICER BANKS: It's much more specific and detailed leaving —
THE WITNESS: Yea, exactly.
 HEARING OFFICER BANKS: What is a diagnosis? Could you tell me that?
 THE WITNESS: Diagnosis is a name for a condition, name for a disease, name for a disorder. CT Page 9870
In determining whether EB "perceived" Tucker to have a medical condition, the issue before the Hearing Officer was not whether EB's decision to place Tucker on restrictive work status was reasonable under the circumstances nor was the issue whether EB had a discriminatory motive or intent.
In discussing whether an employer perceived an employee to have a handicap, the court in Dairy Equipment Co., supra, at page 336 stated in part as follows:
 The Complaint would not have been terminated if he had two kidneys. The company discharged the respondent as they concluded that he could not work on top of the steel tanks for if he fell he might injure his remaining kidney. Thus, they perceived the respondent's physical condition as a handicap that limited his capacity to work.
So in this case EB perceived that Mr. Tucker suffered from claustrophobia and that it limited his capacity to work. The work restrictions imposed on him as a condition of employment directly related to claustrophobia conditions. Based on the quoted transcript and the work restrictions imposed, this court concluded that the Hearing Officer erred in finding that EB did not perceive Mr. Tucker to have claustrophobia.
III. THE COMMISSION'S CLAIM THAT THE HEARING OFFICER USED AN IMPROPER LEGAL ANALYSIS.
The Commission argues that the McDonnell test of employment discrimination should not have been used since this was a case of "overt discrimination." The commission claims the Hearing Officer was wrong in finding that "the evidence does not reveal any direct statements that can be attributed to the employer that would indicate `highly probative evidence' of illegal discrimination." The parties do not dispute the fact that where there is "overt discrimination", the McDonnell standard is not applicable. In Lee v. Russell County Board of Education, 684 F.2d 769 (1982), the court at page 773-774 stated in part as follows:
 The McDonnell Douglass analysis is only one means of proving a case of discrimination, however. It is not the exclusive means. Furnco Construction Corp. v. Waters, 438 U.S. 567, 576, 98 S.Ct. 2945, 2949, 57 L.Ed.2d 957 (1978); International CT Page 9871 Brotherhood of Teamsters v. U.S., 431 U.S. 324, 357-58, 97 S.Ct. 1843, 1865-1866, 52 L.Ed.2d 396 (1977); Lee v. Conecuh County Board of Education, supra, 634 F.2d at 962; McCuen v. Home Insurance Co., 633 F.2d 1150, 1151-52 (5th Cir. 1981); McCorstin v. U.S. Steel Corp., 621 F.2d 749, 753-554 (5th Cir. 1980). The McDonnell Douglas analysis is "(i)ntended progressively to sharpen inquiry into the elusive factual question of intentional discrimination," Burdine, 450 U.S. at 253 n. 8, 101 S.Ct. 1089 at 1094 n. 8, where the plaintiff's case if made out with circumstantial evidence supporting the inference of discrimination, id. at 253, 101 S.Ct. at 1093. Where a case of discrimination is made out by direct evidence, reliance on the four-part test developed for circumstantial evidence is obviously unnecessary. See, e.g., Ramirez v. Sloss, 615 F.2d 163, 168 n. 9 (5th Cir. 1980); Crawford v. Western Electric Co., Inc., 614 F.2d 1300, 1315 (5th Cir. 1980).
Both parties also referred to Bell v. Birmingham Linen Service, 715 F.2d 1552 (1983). Bell involved a case where a female employee brought a sex discrimination in employment action alleging that the employer declined to promote her because she was a woman. In discussing the method to use to prove discrimination the Bell court at pages 1556-57 stated in part as follows:
 It should be clear that the McDonnell Douglas method of proving a prima facie case pertains primarily, if not exclusively, to situations where direct evidence of discrimination is lacking. It would be illogical, indeed ironic, to hold a Title VII plaintiff presenting direct evidence of a defendant's intent to discriminate to a more stringent burden of proof, or to allow a defendant to meet that direct proof by merely articulating, but not proving, legitimate, nondiscriminatory reasons for its action.
 Following these principles, this court has held that where a case of discrimination is proved by direct evidence, it is incorrect to rely on a McDonnell Douglas rebuttal. CT Page 9872 Lee v. Russell County Board of Education, 684 F.2d 769, 774 (11th Cir. 1982). If the evidence consists of direct testimony that the defendant acted with a discriminatory motive, and the trier of fact accepts this testimony, the ultimate issue of discrimination is proved.
The facts in Bells were that the plaintiff applied for a job referred to as a "washman position." In holding that the McDonnell test was not applicable to the facts as found by the lower court, the Bell court stated in part as follows:
 The district court in this case specifically accepted as credible testimony indicating that BLS's decision-maker, Gus Westbrook, stated that he would not allow Bell into the washroom because if she were allowed in, all women would want to enter." This testimony is "highly probative evidence" of illegal discrimination.
The question involved in this case is whether when an employer perceives a prospective employee to have a particular handicap and imposes work conditions or restrictions based on that handicap whether such conditions or restrictions constitute evidence of direct or overt discrimination. If an employer says to a prospective employee who has claustrophobia that the employee will not be hired because of the claustrophobia, in this court's opinion that would clearly constitute evidence of direct or overt discrimination. EB admittedly did not refuse to hire Tucker. Instead what it did was to impose work restrictions that would not qualify him to be hired. As stated earlier, the purpose of the statute prohibiting discriminatory employment practices is to prohibit acts, not status. It is part of a policy to eliminate discrimination in its subtle as well as overt forms. The very act of classifying individuals by means of criteria irrelevant to the ultimate end sought to be accomplished operates in a discriminatory manner. The placing of a job restriction on a person perceived to have claustrophobia prohibiting him from employment that involves work in a tight or restricted area results in that person being eliminated from the job market.
The door to employment was affectively closed on Tucker by imposing the work conditions that he would not be allowed to have any job as a carpenter that involved work in tight spaces. The question of whether there has been direct testimony that the defendant acted with a discriminatory motive must be judged on the nature of the employment practice that is CT Page 9873 involved. In Connecticut Institute for the Blind v. Connecticut Commission On Human Rights and Opportunities, 176 Conn. 88
(1978) the court held to be a discriminatory employment practice a refusal to employ a teacher's aide because she had impaired vision. What EB has in effect done in this case is refuse to hire Tucker because it perceived him to have claustrophobia. This is a case of overt discrimination.
This court is not ruling on the validity of the claim of EB that this is a case of bona fide occupational qualification or on any of the other special defenses raised by EB. Those issues were not resolved by the Hearing Officer and must first be resolved by the Hearing Officer.
ORDER
The case is remanded to the Hearing Officer to rule on the special defenses raised by EB.
Axelrod, J.